Shawn Carlson, Plaintiff-Respondent,
v.
Frank B. Gleichsner D/B/A Crestview Auto Sales, Defendant-Appellant.
No. 04-1376.
Court of Appeals of Wisconsin.
Opinion Filed: February 3, 2005.
¶1 DYKMAN, J.
Frank B. Gleichsner d/b/a Crestview Auto Sales appeals from a money judgment in favor of Shawn Carlson for damages to a 1991 Lincoln automobile arising from his sale of the automobile to Carlson.[1] Gleichsner asserts that because he sold the vehicle "as is" and the trial court found that he and Carlson knew that there was no warranty on the vehicle, the trial court erred in concluding that he was liable for repairs after the sale. We agree and therefore reverse as to all damages except for $26.81, the cost of a used speedometer gear, together with applicable small claims costs.
¶2 Gleichsner appears pro se. For his benefit, we explain the rules under which we, and all appellate courts, operate. This court does not conduct a new trial. We do not find facts. We review what happened in the circuit court. We examine the facts found by the trial court to determine if they are clearly erroneous and will only reverse if they are. State v. Deilke, 2004 WI 104, ¶10, 274 Wis. 2d 595, 682 N.W.2d 945. We do not consider the evidence that might have supported contrary findings by the trial court. Instead, we search the record for evidence to support the findings the trial court did make. City of Stoughton v. Thomasson Lumber Co., 2004 WI App 6, ¶28, 269 Wis. 2d 339, 675 N.W.2d 487. Here, the trial court accepted Carlson's testimony as to the facts and not Gleichsner's. Accordingly, we must do the same.
¶3 Gleichsner first asserts that the trial court erred in its interpretation of WIS. ADMIN. CODE § TRANS 139.03 (Feb. 2004),[2] and argues that Carlson could have received the name and address of the previous owner of the car had he wanted that information. Gleichsner is probably referring to Carlson's testimony that Gleichsner told him that the car was previously owned by an old lady in Iowa. We do not see the significance of this observation. The trial court did not rely on the identity of the previous owner as a reason for its decision. There was no evidence that the car was not owned by an old lady in Iowa. And whether it was or not, we question the relevance of the identity of the previous owner of the car. Buying a car from the little old lady from Pasadena would not guarantee a defect free car.[3] We conclude that concerns about the car's previous owner do not convince us that the trial court's judgment should be reversed.
¶4 The next issue Gleichsner raises has to do with the car's speedometer. Since the trial court required Gleichsner to reimburse Carlson for the $298.77 cost of a diagnosis of the car's speedometer problem, Gleichsner's liability for the cost is relevant. The record shows that when Carlson bought the car, both he and Gleichsner knew the speedometer was not operating. On crossexamination, the following testimony ensued:
Q: (By Gleichsner) The day when you bought the vehicle, did I offer to fix the speedometer knowing that it had quit working?
A: (By Carlson) Yes. You said that if you get the part, bring it in, it was a simple $15 part, that it wouldn't be time consuming. It would be really easy.
Q: If it was not the speed sensor, it would be the speedometer gear itself?
A: No. You told me it would be the speed sensor wiring harness, and you told me it was a $15 part, that it would be real easy to order, and bring it in and it would be fixed.
Q: You and your stepfather were going to make that repair?
A: No. You told me you were going to do that. I went and bought the part, brought it to you, and that wasn't I guess the solution for the speedometer to work.
Q: Was there any charge for that?
A: No. But you told me there was not gonna be no charge, that you would fix it.
¶5 Carlson testified that after Gleichsner installed the wiring harness, the speedometer still did not work, so he incurred $298.77 for a diagnosis from another dealership which showed that a gear in the speed sensor had failed, necessitating its replacement. He obtained a used gear, took it to Gleichsner, who installed it, whereupon the speedometer again operated. The question is Gleichsner's liability for the diagnosis.
¶6 We conclude that Gleichsner contracted with Carlson to repair the speedometer, and that this contract was separate from, and not negated by, the "as is" purchase of the car. But we question whether Gleichsner breached the contract by failing to repair the speedometer, or whether Carlson breached the contract by not giving Gleichsner the opportunity to do so. Carlson was asked: "And you discovered that it was something other than the wiring harness; is that correct?" and he answered "Yes." But a critical question was never posed. Carlson's attorney might have asked: "After the wiring harness was installed and you discovered that the speedometer still did not work, did you return the car to Gleichsner for further repair?" The answer would probably have permitted the trial court or us to determine whether Carlson or Gleichsner breached the contract.
¶7 The evidence is not sufficient for us to make that determination. As a result, we must rely on burden of proof to solve the problem. As plaintiff, Carlson had the burden to show that the Gleichsner breached the contract to repair the speedometer. See State v. Windom, 169 Wis. 2d 341, 347, 485 N.W.2d 832 (Ct. App. 1992). He failed to meet this burden. Accordingly, he cannot recover for the diagnostic test of the speedometer. But he did prove the cost of the gear which Gleichsner used to repair the speedometer, which was $26.81. That part was necessary for Gleichsner to fulfill his contract, and he is liable to Carlson for its cost. The same is not true of the cost of the wiring harness. Carlson testified on cross-examination: "You said if you get the part, bring it in, it was a simple $15 part, that it wouldn't be time consuming. It would be really easy." This shows that it was Carlson's obligation to provide the wiring harness.
¶8 Next, Gleichsner asserts that the trial court erred by concluding that he violated WIS. ADMIN. CODE § TRANS 139.02(15)(a) and sold the car knowing that it was not in good condition. Section TRANS 139.04(4) requires a motor vehicle salesperson to disclose significant mechanical, electrical and electronic defects before selling a car. That section concludes: "Disclosure of information shall be that which the licensee can find using reasonable care." The Wisconsin Buyer's Guide applicable to the car Carlson bought, marked Exhibit Six, shows a checked "no" in the columns pertaining to the car's engine. By using this form, Gleichsner told Carlson that the engine showed no sign of excessive oil consumption, exhibited no unusual noises, had no signs of a cracked block or head or blown head gasket, and did not miss or backfire. As Gleichsner notes, reasonable care does not require him to take a vehicle apart or run tests unless it is necessary to diagnose apparent symptoms. Gleichsner asserts that he did all that was required of him under applicable motor vehicle trade practices rules, and that the trial court erred by finding that he must have necessarily known that the car was not in good condition.
¶9 The trial court's findings and conclusion were:
Based upon the testimony presented in this matter, I find that there was a sale of the vehicle. I find that there was no warranty and that the buyer ... acknowledged that fact.
I find that the car was not in good condition and that the condition that it was in was not one that could be discovered with a five-minute drive. And I further find that the seller of this car, in the reasonable exercise of being in the business of operating a car and having rehabbed this car, must have necessarily known that it was not in good condition.
I find that thewhile there was no warranty, that the seller represented that the car was in good condition and that that representation was false and that that false statement inducedwas an inducement to enter into the contract.
And I find, therefore, that the defendant is entitled to the damages he suffered as a result.
¶10 We focus on the trial court's finding that because Gleichsner was in the business of operating a car and had rehabbed the car, Gleichsner must have known that the car was not in good condition.
¶11 First, we conclude that it is improbable that the trial court used Gleichsner's ability to operate a car as a reason for his liability to Carlson. The trial court probably meant that because Gleichsner operated a used car business, he must have known of the car's defects. But we will also assume that the trial court meant that a driver must know of his or her car's defects. We have examined the record to find support for these findings. We do not find that support. Gleichsner did operate a used car business. But there is no evidence that used car dealers have an ability to diagnose a potential connecting rod failure without hearing an unusual noise or disassembling an engine. No one testified as to an unusual noise. No expert testified that there must have been an unusual noise if the connecting rod failed soon after purchase. We do not know why connecting rods fail, or the symptoms prior to a catastrophic engine failure.
¶12 The same is true of the trial court's finding that Gleichsner had "rehabbed" the car. There is no evidence of any "rehabbing." The only thing the trial court might have been referring to is the buyer's guide that Gleichsner's employee filled out and Gleichsner signed. But we have explained the significance of this document, required by the Wisconsin Department of Transportation. All that it requires is that a used car dealer inspect a car for specific evidence of defects. There is no evidence that any of the potential defects listed on the buyer's guide existed on the car Carlson bought. The trial court's finding that Gleichsner "rehabbed" the car is clearly erroneous. The trial court's inference that Gleichsner must have known that the car's engine was about to catastrophically fail is not one that can be drawn from the facts that Gleichsner operated a car, was in the used car business, and filled out the buyers guide. In short, we find no evidence to support the majority of the trial court's judgment. But we must now consider Carlson's brief because he asserts that on these facts, WIS. ADMIN. CODE § TRANS 139.03 renders Gleichsner liable to him.
¶13 Carlson argues that the trial court properly concluded that Gleichsner violated WIS. ADMIN. CODE § TRANS 139.03(1). He supports this by noting that the car had been in Gleichsner's possession since June 22, 2000, that the buyer's guide was completed on April 15, 2003, and that Gleichsner testified that he occasionally personally used the car without problems. He concludes that § TRANS 139.03(1) "specifically prohibits such a blatant unfair practice."
¶14 WISCONSIN ADMIN. CODE § TRANS 139.03(1) provides: "The use of false, deceptive or misleading advertising or representations by any licensee to induce the purchase of a motor vehicle constitutes an unfair practice and is prohibited." But Carlson does not link the rule to Gleichsner's conduct. He does not point out what advertising or representation was false. He cites no authority prohibiting a used car dealer from using a car held for sale for personal purposes. We fail to see a problem with the timing of the buyer's guide. It would seem reasonable that a buyer's guide be filled out as close to sale as possible, rather than when the dealer acquires the car.
¶15 Carlson also argues that Gleichsner told him that the car was a good vehicle, would last him through high school, was a reliable car, was in great condition, and that the engine was rebuilt. He quoted Gleichsner as saying: "If you can find anything wrong with the car, bring it back." He notes that he was not yet sixteen years old at the time, and an inexperienced, first-time automobile buyer. He concludes again that the representations and inducements were a violation of WIS. ADMIN. CODE § TRANS 139.03.
¶16 Carlson's brief goes no further. He apparently concludes that whether or not Gleichsner knew of the car's engine problems, Gleichsner is liable because the car was not reliable. There is no evidence that the engine was or was not rebuilt, or that the car was or was not in great condition when it was sold, though Carlson suggests an inference that the car must not have been in great condition if it threw a rod eighty miles after he purchased it. Carlson does not explain whether the misrepresentation he alleges was intentional, strict responsibility or negligent misrepresentation, or whether WIS. ADMIN. CODE § TRANS 100.18 (Aug. 1996) is a form of strict liability misrepresentation which has elements different from common law misrepresentation. See Ollerman v. O'Rourke Co., Inc., 94 Wis. 2d 17, 24-25, 288 N.W.2d 95 (1980) (identifying three types of misrepresentation). We have said that when a party fails to cite legal authority specifically supporting a proposition, we refuse to consider such an argument. State v. Shaffer, 96 Wis. 2d 531, 545-46, 292 N.W.2d 370 (Ct. App. 1980).
¶17 While we do not find any published cases interpreting WIS. ADMIN. CODE § TRANS 139.03(1), WIS. STAT. § 100.18 (2003-04)[4] has an extensive history. The rule and the statute are similar in that both prohibit deceptive, misleading, false or untrue statements to induce a purchase. Whether a used car salesman's statement that a car is reliable or in great condition leads to § TRANS 139.03(1) liability is a question of significant import in a sales oriented society. Without assistance from Carlson, we must rely on Shaffer to conclude that Carlson has not shown why Gleichsner is liable to him.
¶18 Even though we rely on Shaffer for our decision, we question whether car sales persons must refrain from giving any information about cars to avoid WIS. ADMIN. CODE § TRANS 139.03(1) liability. The economic loss doctrine bars negligence, strict liability and intentional misrepresentation claims. Tietsworth v. Harley Davidson, Inc., 2004 WI 32, ¶29, 270 Wis. 2d 146, 677 N.W.2d 233. But the economic loss doctrine is not applicable to WIS. STAT § 100.18 cases. Kailin v. Armstrong, 2002 WI App 70, ¶43, 252 Wis. 2d 676, 643 N.W.2d 132. It likely would not bar § TRANS 139.03(1) cases either. But sellers are permitted to engage in "puffery," defined as "exaggerations reasonably to be expected of a seller as to the degree of quality of his product, the truth or falsity of which cannot be precisely determined." Tietsworth, 270 Wis. 2d 146, ¶41. While the dissent in Tietsworth criticizes the doctrine because opinions and facts drift into one another and because the dissenting justice views puffery as a factual question, a dissent is what the law is not. State v. Perry, 181 Wis. 2d 43, 49, 510 N.W.2d 722 (Ct. App. 1993).
¶19 Under the definition in Tietsworth, Gleichsner's statements are puffery. "Good" is in the eye of the beholder. "Last through high school" is similarly vague. As Exhibit 1, a bill from Bilderbeck's Auto Parts, notes: "All cars run on used parts." How many parts and how much labor is necessary to enable a car to last four years is unknowable. An $800 engine installed in a $3500 car may or may not be a good investment. The same is true for "reliable." All used cars (and even new ones) need maintenance. How much maintenance is necessary for a car to become unreliable is an unknowable fact. We have dealt with Gleichsner's statement that the engine had been rebuilt and was in great condition. Whether it was rebuilt is unknown. Although the engine catastrophically failed, its condition when sold and the use to which it was put in the eighty miles since then is not apparent from the record. No one testified that the engine must have been in bad condition for it to fail when it did. Were we to reach the question, we would conclude that these statements are non-actionable puffery.
¶20 "If you can find anything wrong with the car, bring it back" is not puffery. It is an affirmative statement which, in the absence of a warranty or agreement that the car was sold without a warranty, might be a contract. But it cannot be a contract to repair the car for an indefinite time. As used in connection with the trial court's finding that the car was sold without a warranty, the statement can only reasonably be interpreted as meaning that the car had no problems when sold, other than those noted, and that if it had problems when sold, Gleichsner would remedy the problems. Therefore, we would conclude, were we to reach the question, that Gleichsner's statement was not a warranty requiring Gleichsner to replace the car's engine.
¶21 Carlson argues that Gleichsner's appeal should be dismissed because he failed to reference the pages of the brief on which statutes and other authorities are cited, and does not contain a statement of facts with references to the record. He also asks that we dismiss the appeal because Gleichsner failed to include an appendix in his brief. We decline the invitation. A decision under WIS. STAT. RULE 809.19(2) to grant summary reversal is discretionary. Raz v. Brown, 2003 WI 29, ¶14, 260 Wis. 2d 614, 660 N.W.2d 647. And to dismiss, we must determine that the appellant has demonstrated bad faith, egregious conduct or a common sense finding that the appeal has been abandoned. Id. We cannot make those determinations. This case has a small record. Gleichsner's failures have not caused us lost time, and he has presented the issues he raises in an understandable format. We conclude that the appropriate sanction for Gleichsner is to deny him appellate costs even though he substantially prevailed. And since Carlson has prevailed only as to a very small portion of his damages, we deny him costs as well.
By the Court.Judgment affirmed in part; and reversed in part, and cause remanded with directions.
NOTES
[1] The record shows that Carlson was three weeks shy of his sixteenth birthday when he bought the car from Gleichsner. Neither party has briefed the significance of this fact, or the liability of a minor for a contractual obligation. We therefore do not pursue this issue.
[2] All references to section TRANS 139 of the WISCONSIN ADMINISTRATIVE CODE are to the most recent version, published February 2004, unless otherwise noted.
[3] "The Little Old Lady from Pasadena," Copywrite 1964, Don Altfeld and Roger Christian, originally recorded by Jan & Dean.
[4] All references to the Wisconsin Statutes are to the 2003-04 version unless otherwise noted.